# In the United States Bankruptcy Court
## for the
### Southern District of Georgia
#### Savannah Division

**FILED**
Lucinda B. Rauback, Clerk
United States Bankruptcy Court
Savannah, Georgia
*By dreese at 4:56 pm, Jun 24, 2016*

In the matter of:           )

GRANT ROBERT ROGERS, and    )
ALLISEN NICOLE ROGERS;      )

            )

     *Debtors.*           )

Chapter 11 Case

Number <u>14-40219-EJC</u>

## OPINION ON APPROVAL OF DEBTORS' DISCLOSURE STATEMENT

Pending before the Court is approval of the Disclosure Statement (dckt. 173) filed by the individual Chapter 11 debtors, Grant and Allisen Rogers (the "Debtors"). The Debtors are the sole members[1] of the limited liability company known as Wetdog, LLC ("Wetdog"), which owns the Foley House Inn (the "Inn"), a bed and breakfast in the historic district of Savannah, Georgia. The Debtors primary source of income is from their management of the Inn.

This matter came before the Court on February 25, 2016 upon objections raised by the main creditor in this case, Belle Resources, Ltd. ("Belle"), which holds a first-in-priority lien on the Inn, and the United States Trustee ("UST"). Belle and the UST objected to the Disclosure Statement on several grounds, including violation of the absolute priority rule and the Debtors' valuation of their ownership interests in Wetdog at $-0-.

The principal issue before the Court is the Debtors' ability to confirm their

---

[1] Wetdog was formed by the Debtors as a California limited liability company. Pursuant to California's LLC laws, persons with an ownership interest in an LLC are defined as "members." Cal. Corp. Code. § 17701.02(p).

AO 72A
(Rev. 8/82)

Amended Plan of Reorganization filed on December 20, 2015 (the "Plan") (dckt. 172) by means of cramdown under 11 U.S.C. § 1129(b). Belle and the UST contend that the Debtors' Plan cannot be confirmed because it violates the absolute priority rule set forth in § 1129(b)(2)(B)(ii), and thus approval of the Disclosure Statement is inappropriate. In addition, Belle contends that if the Debtors seek to satisfy the "new value" exception to the absolute priority rule, the Court must hold an auction to determine the value of the Debtors' ownership interest in Wetdog. However, the Debtors argue that after BAPCPA[2], the absolute priority rule no longer applies in individual Chapter 11 cases. But if the absolute priority rule applies, the Debtors contends that the submission of evidence, presumably in the form of expert testimony, is sufficient to establish the value of any property they propose to retain.

For the reasons set forth below, the Court holds that the absolute priority rule still applies to individual Chapter 11 cases post-BAPCPA. In addition, the Court holds that the "new value" exception to the absolute priority rule is also applicable in individual Chapter 11 cases. Because the Court finds that the Debtors' Plan, as proposed, violates the absolute priority rule, the Court will enter an order denying approval of the Disclosure Statement.[3] Further, as will be explained, the Court will not require an auction of the

---

[2]The Bankruptcy Abuse Prevention And Consumer Protection Act of 2005, Pub. L. No. 109-8, 119 Stat. 23 (2005).

[3]At the February 25, 2016 hearing, the Debtors were made aware of several other minor deficiencies with the Disclosure Statement in its present form. Because the Debtors can remedy these deficiencies by simply providing additional disclosures, the Court finds it unnecessary to discuss them at length in this opinion.

Wetdog interests, but instead will set a valuation hearing and allow the parties to introduce evidence as to the value of the Debtors' non-exempt property, including the Debtors' ownership interest in Wetdog. Once these values are determined, the Debtors may then file an amended disclosure statement[4] and plan of reorganization in an effort to meet the "new value" exception or otherwise satisfy the absolute priority rule.

## I. JURISDICTION

This Court has subject-matter jurisdiction pursuant to 28 U.S.C. § 1334(a), 28 U.S.C. § 157(a), and the Standing Order of Reference signed by then Chief Judge Anthony A. Alaimo on July 13, 1984. This is a "core proceeding" within the meaning of 28 U.S.C. § 157(b)(2)(L). In accordance with Bankruptcy Rule 7052, the Court makes the following findings of fact and conclusions of law.

## II. FINDINGS OF FACT

A. The Background

Wetdog was established by the Debtors in September 2001 for the sole purpose of purchasing a bed and breakfast in Borrego Springs, California. In April 2006, Wetdog sold the California inn and used the proceeds to make a sizeable down payment on the purchase of the Foley House Inn (the "Inn"). Wetdog financed the remaining balance of the purchase price with a loan from the Sterling Bank. The loan is evidenced by a certain

---

[4] On March 25, 2016, while this matter was under advisement, the Debtors filed an Amended Disclosure Statement (dckt. 190) and Second Amended Chapter 11 Plan (dckt. 189). This appears to be an attempt by the Debtors to propose a plan that would satisfy the absolute priority rule. However, as will be explained, the Court still finds it necessary to hold a valuation hearing prior to considering this amended disclosure statement.

promissory note (the "Wetdog Note") dated September 15, 2006 in the original principal amount of $1,940,000.00. As collateral, Wetdog granted Sterling Bank a first-in-priority lien on the Inn and the Debtors both executed an unconditional personal guaranty. Wetdog also obtained a $1,361,000.00 loan from the Small Business Administration. To secure this loan, Wetdog executed a promissory note in favor of the SBA (the "SBA Note") and granted SBA a second-in-priority lien on the Inn. As additional collateral, the Debtors also personally guaranteed the SBA Note.

Beginning in 2012, Wetdog fell behind on its monthly payments required under the Wetdog Note. Accordingly, on March 26, 2013, Comerica Bank (as successor in interest to Sterling Bank) notified Wetdog that it was in default and demanded full repayment within ten days. On April 5, 2013, in response to Comerica's demand, Wetdog filed a voluntary Chapter 11 petition, designated as case number 13-40601-EJC. (Wetdog Dckt. 1).

B. Wetdog's Confirmed Chapter 11 Plan

Wetdog's two largest creditors, Belle[5] and SBA, held secured claims of $1,882,320.14 and $1,365,762.09, respectively. On September 8, 2014, this Court confirmed Wetdog's Chapter 11 plan of reorganization. (Wetdog Dckt. 187). Under the terms of Wetdog's confirmed plan, Belle's secured claim will be paid in full at 5.25% interest in 228 monthly payments of $11,279.76, and a final balloon payment due nineteen years after the

---

[5]On August 6, 2013, Comerica Bank filed a proof of claim for $1,882,320.14 in the Wetdog Case. Shortly thereafter, on August 13, 2013, Belle purchased the then in default Wetdog Note from Comerica. (Wetdog Dckt. 47). On August 29, 2013, Comerica filed a notice of transfer of its claim to Belle. *Id.*

first monthly payment. (Wetdog Dckt. 102). Further, Wetdog's plan provides for the bifurcation of SBA's claim into a secured claim of $1,057,080.90 and an unsecured claim of $308,681.19. *Id.* The secured portion of SBA's claim will be paid in full in monthly payments of $4,610.25 until the claim is satisfied. *Id.* The unsecured portion of SBA's claim will be paid as a general unsecured claim. *Id.* Under the confirmed Wetdog plan, general unsecured creditors will receive 47.59% of their claims or their pro rata share of $250,000.00, whichever is greater. (Wetdog Dckt. 138). The Wetdog confirmation order was not appealed[6].

C. The Debtors' Chapter 13 Case

As a result of Wetdog's default on the Wetdog Note, the Debtors, as personal guarantors, became liable for the monthly payments. When the Debtors were unable to make such payments, Belle filed a state court lawsuit on November 21, 2013 against the Debtors in the District Court of Harris County (Texas) to recover the amounts owed on the Wetdog Note. On February 5, 2014, while the state court action was still pending, the Debtors filed for Chapter 13 bankruptcy protection[7]. (Dckt. 1).

---

[6] After confirmation, Belle did initiate proceedings to enhance its secured claim pursuant to 11 U.S.C. § 506(b). The Court held that Belle was barred by the *res judicata* effect of the confirmation order which made no provision for attorney's fees despite the fact that Belle was an over-secured creditor. Belle has appealed the denial of their claim for attorney's fees (and certain post-petition interest) to the district court.

[7] After the Debtors filed for bankruptcy, Belle received a default judgment in the Texas lawsuit. However, after learning that a default judgment had been entered, Belle immediately filed a Motion to Vacate the Default Order. An order vacating and memorializing the abeyance of the Texas lawsuit was eventually entered on March 24, 2014.

The Debtors Chapter 13 plan, as originally filed, proposed monthly payments of $1,350.00 for sixty months. (Dckt. 7). On March 24, 2014, the Debtors' largest creditor, Belle, filed its Objection to Confirmation of Chapter 13 Plan of Reorganization (dckt. 24), which raised a number of issues with the proposed plan but did not assert that the Debtors were ineligible for Chapter 13 relief. On April 8, 2014, the Debtors filed their Amended Chapter 13 Plan and Motion (dckt. 36), in which they added the following treatment of Belle's claim:

> The Claim of Belle Resources, Ltd. in the approximate amount of $1,882,320.14 is a contingent and unliquidated claim being paid in full outside of this plan by a third-party, Wetdog, LLC, pursuant to a confirmed Chapter 11 Plan in Case No. 13-40601-EJC, pending in the Southern District of Georgia, Savannah Division. This claim shall receive payments from Wetdog, LLC pursuant to the confirmed plan in that case and shall not be entitled to share in any distribution to creditors under this plan.

*Id.*

On April 11, 2014, O. Byron Meredith III, the Chapter 13 Trustee ("Chapter 13 Trustee") objected to the confirmation of the Debtors' plan. (Dckt. 41). The Chapter 13 Trustee's objection outlined the need for additional information, questioned the Debtors' calculation of disposable income, and asserted that the Debtors' non-exempt equity in various assets may require additional plan payments. *Id.* Like Belle's objection, the Chapter 13 Trustee's objection also did not assert that the Debtors were ineligible for Chapter 13 relief.

On May 2, 2014, Belle filed its Objection to Confirmation of Amended Chapter 13 Plan of Reorganization and Motion to Convert and/or Dismiss (dckt. 44). In this new objection, Belle did assert, as grounds for dismissal or conversion, the Debtors'

ineligibility due to the debt limits of § 109(e). *Id.* At a June 17, 2014 confirmation hearing, the eligibility issue was argued at some length by the parties, and the Court took the matter under advisement. Before the Court ruled on the § 109(e) issue, on August 5, 2014, the Debtors moved to convert their case from Chapter 13 to Chapter 11. (Dckt. 63).

D. The Debtors' Chapter 11 Case

While in Chapter 11, the Debtors have continued to manage their property as debtors-in-possession pursuant to 11 U.S.C. §§ 1107(a) and 1108. The Debtors' principal asset is their 100% ownership interest in Wetdog, which the Debtors value at $0.00. In this case, the Debtors listed Belle as an unsecured creditor with a contingent, unliquidated, and disputed debt of $1,880,000.00. (Dckt. 1, p.23). However, Belle filed an unsecured claim in the amount of $2,058,945.19[8]. (Claims Register 10-1). In addition, the SBA filed an unsecured claim in this case for $1,253,554.26. (Claims Register 7-1). The amount of SBA's claim has not been disputed by the Debtors.

1. The Disclosure Statement and Plan

On December 20, 2015, the Debtors filed their Disclosure Statement and Plan[9] (the "Plan"). (Dckt. 172, 173). The Debtors' Plan proposes to pay unsecured creditors

---

[8]The Debtors have filed an objection to Belle's claim, which is still pending with the Court. However, for purposes of confirmation, the parties have stipulated that the amount of Belle's claim shall be $1,803,400.30. (Dckt. 185).

[9] The Debtors filed their original Chapter 11 plan on February 18, 2015, but did not file a corresponding disclosure statement as required by 11 U.S.C. § 1125(b). As noted above (see n. 1) the Debtors have now filed a Second Amended Plan, creating something of a moving target for the Court. Reference in this opinion to the "Plan" refers to the December 20, 2015 plan.

(except Belle and SBA) yearly pro rata payments for a period of five years, with the total amount distributed equaling twenty-five percent (25%) of their respective claims. (Dckt. 172). Under the terms of the Plan, Belle and SBA will not receive any payments because, according to the Debtors, their claims are being paid in full in the related Wetdog case[10]. *Id.* In addition, the Debtors' Disclosure Statement and Plan provide that title to the Debtors' property shall "vest in the Reorganized Debtors free and clear of all liens, claims, charges or other encumbrances." (Dckt. 173, p. 22). Based upon this provision, the Debtors will retain their non-exempt, pre-petition property (in addition to § 1115 property) upon confirmation of the Plan.

### 2. Belle's Objection

On February 16, 2016, Belle filed its Objection to Disclosure Statement and Objection to Valuation of Assets of the Estate (dckt. 180). In its objection, Belle first argues that the liquidation analysis provided in the Debtors' Disclosure Statement is "incomplete, inadequate, and not instructive to the reader." Belle contends that the liquidation analysis does not provide any information regarding how the Debtors valued their personal property, including why the Wetdog ownership interest is valued at $0.00.

Second, Belle argues that the Debtors' Amended Plan cannot be confirmed, and thus the Disclosure Statement should not be approved. Belle contends that the Plan cannot be confirmed for the following reasons: 1) it is not "fair and equitable" as required

---

[10] This is not true with respect to the SBA. As previously discussed, SBA's claim in the Wetdog Case was bifurcated into secured and unsecured claims. (Wetdog Dckt. 102). Under the Wetdog plan, SBA will be paid a dividend of 47.59% on its unsecured claim or its pro rata share of $250,000.00, whichever is greater. (Wetdog Dckt. 138).

by 11 U.S.C. § 1129(b)(1) because it violates the absolute priority rule; 2) it fails the best interests test under § 1129(a)(7); 3) it does not provide that the Debtors will pay all of their earnings into the plan as required by § 1129(a)(15); and 4) it lacks good faith under § 1129(a)(3).

Last, Belle argues that the Disclosure Statement provides a grossly inaccurate valuation of the Debtors' Wetdog interest. Belle contends that the Debtors' ownership interest in Wetdog is worth at least $150,000.00, based upon the following offer presented to the Debtors by Belle's counsel on January 19, 2016:

> 9 Marina, LLC ("9 Marina") made an offer ("Offer") on February 24, 2014 to purchase all of the Debtors' legal and equitable interest in Wetdog, LLC ("Wetdog") for a lump sum payment of $100,000.00. A copy of the letter is attached hereto. This offer was not acted upon by the Debtors.
>
> Notwithstanding the same, 9 Marina hereby reiterates and also increases its previous offer to acquire all of the Debtors' legal and equitable interest in Wetdog in consideration of a lump sum payment of $150,000.00 ("Offer"). This payment can be made within five (5) business days of the Debtors' acceptance and the Bankruptcy Court's approval of the Offer.
>
> To the extent that a higher offer is made for the Debtors' interest in Wetdog, then 9 Marina is willing to consider possibly raising its Offer and/or entering into an auction for the Debtors' interest in Wetdog.
>
> . . .

(Dckt. 194-1, p. 1).[11]

_____

[11] On March 25, 2016, the Debtors filed an Amended Disclosure Statement and under the liquidation analysis stated the following: "Debtors value their interest in Wetdog, LLC at $0.00, based on the value placed on the Foley House Inn by the Court in the Wetdog, LLC matter, case number 13-040601-EJC (Docket #185), of $2,939,401.00, and an outstanding debt on said property of not less than $3,056,954.56."

(Rev. 8/82)

9

### 3. The UST's Objection

On February 18, 2016, the UST filed its Objection to Disclosure Statement and Plan Confirmation (dckt. 181). The Trustee argues that the Debtors' Plan is not confirmable, and thus disapproval of the Disclosure Statement is appropriate, because the Plan violates the absolute priority rule and fails the best interests test under 11 U.S.C. § 1129(a)(7). In addition, the UST objected to approval of the Disclosure Statement because it fails to contain adequate information, including: no financial performance data for 2015, no notification to creditors of the rights under 11 U.S.C. § 1129(a)(15), and no report regarding the Debtors' investigation into potential avoidance actions.

### 4. The Disclosure Statement Hearing

On February 25, 2016, the Court held a preliminary hearing on the approval of the Debtors' Disclosure Statement. At the hearing, the Court heard arguments regarding all of the objections raised by Belle and the UST. The Debtors agreed to provide additional information to satisfy any concerns regarding the Disclosure Statement's lack of adequate information. However, the parties were unable to agree on Belle and UST's objections relating to the Plan's violation of the absolute priority rule and the Debtors' valuation of their ownership interest in Wetdog. The Debtors urged that BAPCPA eliminated the absolute priority rule in individual Chapter 11 cases. Belle and the UST, on the other hand, argued that the absolute priority rule still applies post-BAPCPA. With regard to valuation, Belle urged that the Court should use an auction process to determine the value of the Debtors' ownership interest in Wetdog. On the other hand, the Debtors argued that the submission

of evidence, likely in the form of expert testimony, would be adequate. At the conclusion of the hearing, the Court requested briefs on two issues: 1) whether the absolute priority rule, after BAPCPA, still applies in individual Chapter 11 cases; and 2) whether the Court may, or must, allow an auction of the Wetdog interest to determine its value. All parties filed briefs supporting their positions on these issues.

For the reasons set forth below, the Court first finds that BAPCPA did not eliminate the absolute priority rule in individual Chapter 11 cases. In addition, the Court finds that the "new value exception" to the absolute priority rule is applicable in individual Chapter 11 cases. As proposed, the Debtors' Plan is in violation of the absolute priority rule and does not propose to offer any "new value." However, the Court will allow the Debtors an opportunity to further amend their Disclosure Statement and Plan to either conform to the absolute priority rule or satisfy the "new value exception." As will be explained, the value of the Debtors' non-exempt property will need to be determined in order for the Court to rule on whether any proposed amendment to the Plan meets the "new value" exception. In order to make this determination, the Court will hold a valuation hearing to allow the parties to present evidence, presumably through expert testimony, of the value of the Debtors' non-exempt property. With regard to the valuation of the Debtors' ownership interest in Wetdog[12], the Court finds that an auction process is not required.

---

[12] Throughout this opinion, the Court has referred to the "Debtors' interest (singular) in Wetdog." In fact, each debtor presumably owns a separate 50% interest in the LLC pursuant to an operating agreement. Whether this distinction makes any difference in determining the collective value of their separate interests remains to be seen.

## III. CONCLUSIONS OF LAW

A. The Absolute Priority Rule

In order to obtain confirmation of a Chapter 11 plan, a debtor must meet the requirements enumerated in 11 U.S.C. § 1129(a)(1)-(16). One of those subsections, § 1129(a)(8), requires that all impaired classes under the plan must vote in favor of and accept the plan. However, under § 1129(b), "if all of the applicable requirements of [§ 1129(a)] other than [§ 1129(a)(8)] are met" the Court may still confirm the plan over the objection of an impaired creditor if it is "fair and equitable." 11 U.S.C. § 1129(b).[13] With respect to a class of unsecured claims, § 1129(b) provides two ways that a debtor may satisfy the "fair and equitable" requirement.

First, a debtor may cram down a class of unsecured creditors if the plan provides that such creditors will receive "property of a value, as of the effective date of the plan, equal to the allowed amount[s] of [their] claim[s]." 11 U.S.C. § 1129(b)(2)(B)(i). Second, a debtor may cram down a class of unsecured creditors if the plan satisfies the "absolute priority rule" set forth in 11 U.S.C. § 1129(b)(2)(B)(ii). The absolute priority rule generally provides that every unsecured creditor in a dissenting impaired class must be paid in full before the debtor, who is an individual, is permitted to retain "any property" under the plan. 11 U.S.C. § 1129(b)(2)(B)(ii). Belle argues that the Debtors' Plan is not "fair and equitable" because it violates the absolute priority rule.

The absolute priority rule originated as a judicially created doctrine emerging

---

[13] This procedure is commonly referred to as "cramdown" because the Court is imposing a plan treatment on an impaired class of creditors over their objection.

out of the realm of corporate, as opposed to individual, bankruptcy cases. *Friedman v. P+P,*

*LLC (In re Friedman)*, 466 B.R. 471 (9 Cir. B.A.P. 2012). This doctrine was first developed

by the Supreme Court in the late nineteenth-century in response to widespread collusion in

the context of railroad reorganizations. To prevent unfair deals between senior creditors and

equity holders, the Court held that "stockholders are not entitled to any share of the capital

stock nor to any dividend of the profits until all the debts of the corporation are paid." *Chi.,*

*Rock Island & Pac. R.R. v. Howard*, 74 U.S. 392, 409–10 (1868).

The absolute priority rule evolved beyond a judicially created doctrine when

Congress codified it as part of the Bankruptcy Code in 1978. *See* 11 U.S.C. §

1129(b)(2)(B)(ii) (1978). As the absolute priority rule continued to evolve after enactment

of the code, issues surrounding the rule and its application to particular cases gradually

reached the Supreme Court. In 1988, the Supreme Court unanimously held that the absolute

priority rule applied in individual Chapter 11 cases. *Norwest Bank Worthington v. Ahlers*,

485 U.S. 197 (1988). With the enactment of BAPCPA in 2005, some courts questioned

whether the absolute priority rule was still applicable in individual Chapter 11 cases.

As part of the BAPCPA amendments, language was added to § 1129(b) with

regard to the application of the absolute priority rule in individual Chapter 11 cases.

Specifically, § 1129(b)(2)(B)(ii) was amended as follows:

B) With respect to a class of unsecured claims -

(i) the plan provides that each holder of a claim of such class receive or
retain on account of such claim property of a value, as of the effective date
of the plan, equal to the allowed amount of such claim; or

(ii) the holder of any claim or interest that is junior to the claims of

> such class will not receive or retain under the plan on account of such junior claim or interest any property, *except that in a case in which the debtor is an individual, the debtor may retain property included in the estate under section 1115, subject to the requirements of subsection (a)(14) of this section.*

11 U.S.C. § 1129(b)(2)(B)(ii) (2005 amendment emphasized). Section 1115 itself was added

to the Bankruptcy Code by BAPCPA, and provides:

> (a) In a case in which the debtor is an individual, property of the estate includes, in addition to the property specified in section 541 -
>
> > (1) All property of the kind specified in section 541 that the debtor acquires after the commencement of the case but before the case is closed, dismissed, or converted to a case under Chapter 7, 12, or 13, whichever occurs first; and
> >
> > (2) Earnings from services performed by the debtor after the commencement of the case but before the case is closed, dismissed, or converted to a case under Chapter 7, 12, or 13, whichever occurs first.
>
> (b) Except as provided in section 1104 or a confirmed plan or order confirming a plan, the debtor shall remain in possession of all property of the estate.

11 U.S.C. § 1115.

Due to varying interpretations of these changes brought about by BAPCPA,

a significant split of authorities has developed regarding the effect of these amendments on

the absolute priority rule when the Chapter 11 debtor is an individual. *In re Maharaj*, 681

F.3d 558, 563 (4th Cir. 2012). The split of authorities involves two different interpretations,

commonly referred to as the "broad" and "narrow" views. Courts adopting the "broad view"

interpret the added language in § 1129(b)(2)(B)(ii) and the newly added § 1115 to mean that

a Chapter 11 debtor who proposes not to pay a rejecting class of unsecured creditors in full

may nonetheless retain all of the debtor's non-exempt, pre-petition property as well as all

post-petition property and earnings and still obtain plan confirmation.[14] Thus, theses courts conclude that, by broadly defining the property that debtors may retain and still effect a cramdown, Congress intended to abrogate the absolute priority rule in individual Chapter 11 cases. On the other hand, courts adopting the "narrow view," which includes five circuit courts of appeal,[15] hold that the amendments to § 1129(b)(2)(B)(ii) and the addition of § 1115 created only a limited exception to the absolute priority rule. That is, an individual Chapter 11 debtor who proposes to cram down unsecured creditors may retain only the post-petition property and earnings referred to in § 1115 and nothing more.

   1. The "Broad View"

        Some "broad view" courts have reasoned that the plain language of §§ 1129(b)(2)(B)(ii) and 1115 eliminates the absolute priority rule as to an individual debtor's entire estate. *In re Shat*, 424 B.R. 854 (Bankr.D.Nev.2010); *SPCP Group, LLC v. Biggins*, 465 B.R. 316 (M.D.Fla.2011); *In re Tegeder*, 369 B.R. 477 (Bankr.D.Neb.2007). These courts hold that when § 1129(b)(2)(B)(ii) references the property "included by" § 1115, it "refer[s] to all property Section 1115 itself references." *Shat*, 424 B.R. at 863. In turn, these courts read § 1115 broadly, finding that an individual debtor's estate under §1115 includes post-petition property and earnings *in addition to* the pre-petition property already

---

[14]*See In re Friedman*, 466 B.R. 471 (9th Cir.BAP 2012); *In re Johnson*, 402 B.R. 851 (Bankr.N.D.Ind.2009); *In re Roedemeier*, 374 B.R. 264 (Bankr.D.Kan.2007); *In re Bullard*, 358 B.R. 541 (Bankr.D.Conn.2007).

[15]*See Zachary v. California Bank & Trust*, 811 F.3d 1191 (9th Cir. 2016); *Ice House America, LLC v. Cardin*, 751 F.3d 734 (6th Cir. 2014); *In re Lively*, 717 F.3d 406 (5th Cir. 2013); *Dill Oil Co., LLC v. Stephens (In re Stephens)*, 704 F.3d 1279 (10th Cir. 2013); *In re Maharaj*, 681 F.3d 558 (4th Cir. 2012).

☖AO 72A
(Rev. 8/82)

established by § 541. *Tegeder*, 369 B.R. at 480. Section 1115 thus absorbs § 541 for individual Chapter 11 cases. Therefore, the absolute priority rule no longer applies to *any* property of an individual debtor's estate.

Other "broad view" courts have recognized the ambiguity of the language in §§ 1129(b)(2)(B)(ii) and 1115, but conclude that Congress intended for the BAPCPA amendments to allow individual Chapter 11 debtors to retain non-exempt, pre-petition property as well as all post-petition property and earnings, and still obtain plan confirmation. *Roedemeier*, 374 B.R. 264; *In re O'Neal*, 490 B.R. 837 (Bankr. W.D. Ark. 2013). The *Roedemeier* court reasoned that several other BAPCPA amendments to Chapter 11 demonstrate that Congress intended Chapter 11 procedures concerning individual debtors to function more like those found in Chapter 13. *See* 374 B.R. at 275-76. Accordingly, in its view, the *Roedemeier* court felt that eliminating the absolute priority rule for individual debtors would be consistent with the perceived Congressional intent to harmonize the treatment of the individual debtor under Chapter 11 with those under Chapter 13, which has no absolute priority rule. *Id.*

### 2. The "Narrow View"

Like some "broad view" courts, a number of courts adopting the "narrow view" have also found the language of §§ 1129(b)(2)(B)(ii) and 1115 to be unambiguous. *In re Draiman*, 450 B.R. 777 (Bankr. N.D. Ill. 2011); *In re Gbadebo*, 431 B.R. 222 (Bankr. N.D. Cal. 2010); *In re Steedley*, No. 09–50654, 2010 WL 3528599, at *2 (Bankr.S.D.Ga. Aug. 27, 2010). However, they reach a starkly different conclusion regarding the "plain"

meaning of these code sections. In contrast to the "broad view," these courts hold that §

1115 merely adds to, but does not replace, § 541's definition of estate property for individual

debtors. *Stephens*, 704 F.3d at 1285. Section 1115 "includes" in the estate only that property

which was not already included by § 541. *Gbadebo*, 431 B.R. at 229. In other words, § 1115

includes only post-petition property and earnings. *Draiman*, 450 B.R. at 821. Accordingly,

these "narrow view" courts hold, based on the plain language of § 1129(b)(2)(B)(ii), that

the absolute priority rule still applies to § 541's pre-petition property, but an individual

debtor's post-petition property and earnings that are added by § 1115 are exempt. *Stephens*,

704 F.3d at 1285.

      Other "narrow view" courts find the language of §§ 1129(b)(2)(B)(ii) and

1115 to be ambiguous, but nonetheless hold that if Congress intended to abrogate the

absolute priority rule it would have more straight-forwardly expressed such an intention. *See*

*In re Martin*, 497 B.R. 349 (Bankr. M.D. Fla. 2013); *In re Lindsey*, 453 B.R. 886 (Bankr.

E.D. Tenn. 2011); *In re Kamell*, 451 B.R. 505 (Bankr. C.D. Cal. 2011). In particular, the

*Martin* court reasoned:

> In *Hamilton v. Lanning*, the Supreme Court, in interpreting another BAPCPA
> amendment, reminds us that "we will not read the Bankruptcy Code to erode past
> bankruptcy practice absent a clear indication that Congress intended such a
> departure." (citations omitted). The concept that the rights of the owners of property
> are subordinate to the rights of the owner's creditors as embodied by the absolute
> priority rule has been a fundamental part of bankruptcy jurisprudence for over 100
> years. (citations omitted).
>
> If Congress wanted to abrogate the absolute priority rule – one of the bedrocks of
> bankruptcy jurisprudence for many decades – it could have done so directly rather
> than by implication. And Congress could easily have done so by simply exempting
> individual debtors in the language of § 1129(b)(2)(B)(ii). (citations omitted). Because
> repeals by implication of such fundamental rights are disfavored, the Court concludes
> the BAPCPA Amendments did not make the absolute priority rule inapplicable to

individual Chapter 11 debtors.

497 B.R. at 357. *See also*, *Lively*, 717 F.3d at 409 ("narrow view" prevails because the opposite interpretation leads to a repeal by implication of the absolute priority rule for individual debtors).

### 3. The Debtors' Plan Violates the Absolute Priority Rule

This Court is persuaded that the decisions adopting the "narrow view" of § 1129(b)(2)(B)(ii) are better reasoned. While it may not be susceptible to a "plain" meaning interpretation, I find the most natural reading of the operative terms in §§ 1129(b)(2)(B)(ii) and 1115 to create only a limited exception to the absolute priority rule for individual Chapter 11 debtors. Further, I agree that "if Congress had intended to abrogate the absolute priority rule, it would have done so in a far less convoluted way, particularly in light of the well-established place of the absolute priority rule in bankruptcy jurisprudence." *Maharaj*, 681 F.3d at 565-66. Accordingly, this Court finds that the absolute priority rule still applies in individual Chapter 11 cases.

In this case, the Debtors' Plan proposes to allow the Debtors to retain their non-exempt, pre-petition property upon confirmation. Further, the Plan proposes to pay only 25% of their general, unsecured creditors' allowed claims, excluding the unsecured claims held by Belle and SBA, who will not receive anything. Therefore, the Debtors' Plan violates the absolute priority rule because it proposes to allow the Debtors to retain property of the estate that is not included in § 1115 without paying unsecured creditors in full.

Since the Plan violates the absolute priority rule, it would be appropriate for this Court to deny approval of the Debtors' Disclosure Statement. *In re Gosman*, 282 B.R.

45, 53 (Bankr. S.D. Fla. 2002) (denying approval of the disclosure statement because the proposed plan is not confirmable because it violates the absolute priority rule). However, courts have recognized that a plan which violates the absolute priority rule may nonetheless be confirmed if the debtor can demonstrate such plan satisfies the so-called "new value exception" or "new value corollary" to the absolute priority rule. *See In re Lee Min Ho Chen*, 482 B.R. 473 (Bankr. D. P.R. 2012).

B. The "New Value Exception"

In 1939, the Supreme Court espoused, in dicta, an exception to the absolute priority rule, the so-called "new value" exception. *Case v. Los Angeles Lumber Products Co.*, 308 U.S. 106 (1939). In *Los Angeles Lumber*, the Supreme Court recognized that "there are circumstances under which stockholders may participate in a plan of reorganization of an insolvent debtor." 308 U.S. at 121. The circumstances justifying owner participation (even where the dissenting unsecured creditor class is not paid in full) included the "necessity" of a fresh contribution of capital to ensure the success of the debtor's bankruptcy. *Id.* Further, the Court stated that the owner's participation "must be based on a contribution in money or money's worth, reasonably equivalent in view of all the circumstances to the participation of the stockholder." *Los Angeles Lumber*, 308 U.S. at 121-22.

Although the "new value" exception was developed with the corporate debtor in mind, it has since been utilized for all forms of debtor entities. In the reorganization of a business, the "new value" exception "allows old equity to succeed in keeping hold of the

corporation, partnership, LLC or presumably, the sole proprietorship." *In re Henderson*, 321 B.R. 550 (Bankr. M.D. Fla. 2005). These kinds of equity security holders, by providing new value in the form of money or money's worth, necessary for the Debtor to survive, and reasonably equivalent to the participation of the equity security holder's interest in the venture, may retain an interest therein. *Id.*

Further, courts have applied the "new value" exception to individual Chapter 11 cases, albeit somewhat inconsistently.[16] In general, these courts hold that an individual Chapter 11 debtor may satisfy the "new value" exception by substituting sufficient new value for the non-exempt property proposed to be retained. *In re Henderson*, 321 B.R. 550, 560 (Bankr. M.D. Fla. 2005) (debtor's proposal to retain non-exempt property would prevent confirmation unless debtor submits sufficient new value to match or exceed the value of the non-exempt property).

This Court agrees that the "new value" exception is applicable in individual Chapter 11 cases. However, as other courts have recognized, it is not an easy task for an individual debtor to satisfy the exception because the new value must typically come from a source other than the debtor.[17] *In re Andrews*, 2015 WL 4608091 at *2 (Bankr. M.D. Tenn.

---

[16] *See also, In re Gerard*, 495 B.R. 850 (Bankr. E.D. Wis. 2013); *In re Draiman*, 450 B.R. 777 (Bankr. N.D. Ill. 2011); *In re Henderson*, 341 B.R. 783 (M.D. Fla. 2006); *In re Rocha*, 179 B.R. 305 (Bankr. M.D. Fla. 1995); *In re Cipparone*, 175 B.R. 643 (Bankr. E.D. Mich. 1994); *In re Harman*, 141 B.R. 878 (Bankr. E.D. Pa. 1992).

[17] Because an individual Chapter 11 debtor may retain exempt property without violating the absolute priority rule, the Court recognizes that a debtor's proposed new value contribution could be funded by the proceeds of such exempt property. *See In re Steedley*, 2010 WL 3528599 (Bankr. S.D. Ga. Aug. 27, 2010) (J. Dalis); *Andrews*, 2015 WL 4608091 at *2 (recognizing that funds from a debtor's exempt retirement account could constitute sufficient new value if reasonably equivalent to the value of the

2015) (the debtor's future income cannot be considered a new value contribution because 11 U.S.C. § 1129(a)(15) already requires an individual debtor to distribute all of his projected disposable income under the plan); *In re Bolton*, 188 B.R. 913 (Bankr. D. Vt. 1995) ("'new' contributions are supposed to be from outside of a debtor's business"); *In re East*, 57 B.R. 14 (Bankr. M.D. La. 1985) ("[i]t is easier in a corporate context to consider the concept of the injection of outside capital; when an individual is involved, it is difficult to imagine the source of such funds: perhaps a relative or friend might make a gift; perhaps there are other sources"); *In re Rocha*, 179 B.R. 305, 307 (Bankr.M.D.Fla.1995) ("The difficulty with extending the new value exception to an individual is that the new value must come from an 'outside' source, meaning it cannot come from the [d]ebtor himself.").

Although it may be the rare case in which an individual Chapter 11 debtor will meet the requirements of the "new value" exception, the Court finds no reason why the Debtors should not be given the opportunity to do so. However, to apply the "new value" exception the Court must determine the value of the non-exempt property that the Debtors propose to retain. Once the value of the Debtors' non-exempt property is determined, the Debtors may file an amended disclosure statement and plan of reorganization in an effort to meet the "new value" exception.

C. The Appropriate Valuation Method

There are no clear guidelines for determining if a debtor's contribution for purposes of the "new value exception" is reasonably equivalent to the value of the interest to be retained. "The determination is factually intense and must be made on a case-by-case debtor's retained non-exempt assets).

basis."[18] *In re Montgomery Court Apartments*, 141 B.R. 324, 345 (Bankr. S.D. Ohio 1992). Belle contends that an auction process is required to determine the value of the Debtors' interest in Wetdog. The Debtors contend, however, that the proper method of determining the value of their Wetdog interest is by introducing evidence of such value through expert testimony.

Belle argues that the Supreme Court's holding in *Bank of Am. Nat'l Trust & Sav. Ass'n v. 203 N. LaSalle St. P'ship* requires an auction process to be implemented to establish value for purposes of the absolute priority rule. *LaSalle*, 526 U.S. 434. In *LaSalle*, certain former partners of the debtor, pursuant to its Chapter 11 plan, were to contribute new capital to the debtor over a five year period in exchange for entire ownership of the newly reorganized debtor. Only old equity holders were permitted to contribute this new capital. The bank, as the sole member of an impaired class of creditors, objected to the plan, and debtor sought to cramdown the plan.

In order to satisfy the "new value" exception, the Court found that it was necessary for the old equity holders to demonstrate that they were paying the full value of their equity interest. *Id.* at 457. The Court opined that the best way to determine the "top dollar" value of such equity interest is exposure to a market. *Id.* Because the debtor's plan failed to provide for a market valuation of its equity interests, the Court concluded that the new value proposed by the old equity holders was insufficient.

---

[18] In the context of a corporate reorganization where equity interests are involved, "[a]n important component of whether the new cash contribution is reasonably equivalent to the future participation is the 'reorganization value' of the reorganized debtor. *Id.* This concept cannot be applied to individual debtors in any meaningful sense.

> Whether a market test would require an opportunity to offer competing plans or would be satisfied by a right to bid for the same interest sought by old equity, is a question we do not decide here. It is enough to say, assuming a new value corollary, that plans providing junior interest holders with exclusive opportunities free from competition and without benefit of market valuation fall within the prohibition of § 1129(b)(2)(B)(ii).

*Id.* at 458.

This Court declines to extend the competitive bidding requirement of *LaSalle* to this case. As stated previously, *LaSalle* involved a debtor partnership's attempt to utilize the "new value exception" by proposing a plan which granted new equity in the reorganized debtor to its old equity holders in exchange for a contribution of new capital. The facts of this case are distinguishable. In this individual Chapter 11 case there are not, and cannot be, equity interests in the Debtors. Accordingly, unlike *LaSalle*, the Debtors are not proposing to grant an equity interest in themselves to a non-debtor party. Rather, the Debtors are proposing to retain pre-petition property, namely their ownership interest in Wetdog, that was not excluded from the absolute priority rule by 11 U.S.C. § 1129(b)(2)(B)(ii).

This Court finds it unlikely that the Supreme Court would require a competitive bidding process every time an individual Chapter 11 debtor attempts to retain non-exempt property by means of the "new value exception." For example, it would be extremely burdensome and unnecessary to hold a competitive bidding process to determine the value of a pre-petition vehicle proposed to be retained by the Debtor in a Chapter 11 plan when the value of such vehicle can be easily and reliably obtained through the introduction of evidence. More importantly, if an auction is used to prove the value of the asset to be retained, the asset will be conveyed away to a third party (unless the debtor is the

successful bidder) without the debtor having an opportunity to propose another plan provision to address such valuation. That is particularly troubling here since the Debtors' ownership of Wetdog is their primary source of income. Once that asset is auctioned off, the likelihood of a successful reorganization in this case is diminished.

As explained above, this Court believes that the competitive bidding requirement set forth in *LaSalle* does not extend to the facts of this case. Even if the Court were to find that some form of market valuation must be available to test the adequacy of the Debtors' proposed new value contribution, Belle has had (and still has) ample opportunity to file a competing plan in this case[19]. *LaSalle*, 526 U.S. at 457-58 (suggesting that the opportunity to offer competing plans may satisfy a "market test"). In order to determine whether the Debtors have met the "new value exception," the Court will allow the parties to introduce evidence of the value of the Debtors' non-exempt property[20]. If the evidence of valuation is not satisfactory to the Court, then an auction process may be proper unless the absolute priority rule can be otherwise satisfied.

---

[19]Pursuant to 11 U.S.C. § 1121, Belle may file a plan if the Debtors did not file a plan before the exclusivity period expired or if the Debtors have not filed a plan that has been accepted before 180 days after the date of the order of relief. 11 U.S.C. § 1121(c)(2)-(3). In this case, the exclusivity period expired on December 3, 2014. The Debtors did not file a plan until February 18, 2015. Further, the 180-day deadline has come and gone without an accepted plan.

[20] The Court's valuation of the Debtors' pre-petition property, to the extent it is in dispute, will also have an impact on the resolution of other objections filed by Belle and the UST. For example, if the Court finds that the Debtor's non-exempt assets have significant value, the Debtors' ability to satisfy the best interests test under 11 U.S.C. § 1129(a)(7) will likely become a major obstacle to confirmation.

## IV. CONCLUSION

This Court concludes that the 2005 amendment to § 1129(b)(2)(B)(ii) and the addition of § 1115 did not eliminate the absolute priority rule in individual Chapter 11 cases. Instead, these BAPCPA amendments created only a limited exception to the absolute priority rule. That is, an individual Chapter 11 debtor who propose to cram down dissenting unsecured creditors may retain only the post-petition property and earnings referred to in § 1115. However, the Court also finds that the "new value" exception to the absolute priority rule is applicable in individual Chapter 11 cases. Accordingly, an individual Chapter 11 debtor may retain non-exempt, pre-petition property that is not excluded from the absolute priority rule by § 1129(b)(2)(B)(ii) if he is able to inject sufficient new value into the plan to match or exceed the value of the non-exempt property proposed to be retained. Further, this proposed new value must be in the form of money or money's worth and from an "outside" source, unless exempt property is contributed for this purpose.

As proposed, the Debtors' Plan violates the absolute priority rule because it allows the Debtors to retain their non-exempt, pre-petition property without paying unsecured creditors in full. Accordingly, the Debtors' Plan is not confirmable, and the Court will enter an order denying approval of the Disclosure Statement. However, the Debtors may amend their Disclosure Statement and Plan in an effort to meet the "new value" exception, or otherwise satisfy the absolute priority rule.

As previously mentioned, while this matter was under advisement, the Debtors filed a Second Amended Disclosure Statement and Amended Plan, which appears to attempt

to provide "new value" of $125,000.00 in the form of a loan from a relative. However, the Court will not take up approval of the Second Amended Disclosure Statement, or any further amendments, until this Court determines the value of the Debtors' non-exempt property. In order to make such a determination, the Court will hold a valuation hearing to allow the parties to submit evidence regarding the value of the Debtors' non-exempt property, including the Debtors' ownership interest in Wetdog.

A separate order will be entered contemporaneously with this Opinion.

Dated at Savannah, Georgia, this 24th day of June, 2016.

Edward J. Coleman, III, Judge
United States Bankruptcy Court
Southern District of Georgia